LITTLE ROCK & FORT SMITH RAILWAY COMPANY VS. BARKER AND WIFE.

1. DAMAGES: *Measure of, for injuries resulting in death.*
The measure of damages to a mother for the negligent killing by a railway train, of her infant child, is, under the statute, the expense necessarily incurred by her for medical attendance, nursing, and burial of the child, and reasonable compensation for the loss of the probable services of the child during its minority. For the loss of companionship and association of the child, and the grief of the mother at its death, the statute gives no compensation.

2. PRACTICE AT LAW: *Instructions.*
Where there is any evidence tending to prove the issue for the plaintiff, the Circuit Court can not instruct the jury that there is no evidence on which they can find a verdict for him.

3. SAME: *Motion for new trial. Practice in Supreme Court.*
Where a motion for new trial does not object that the verdict is contrary to the evidence, or is without evidence in support of it, the Supreme Court will not consider the sufficiency of the evidence further than may be necessary in considering the correctness of the instructions based upon it.

4. SAME: *Instructions.*
In basing an instruction on hypothetical facts, disputed facts should not be assumed to be true, nor should facts be stated hypothetically which do not appear in evidence.

APPEAL from *Lonoke* Circuit Court.

Hon. J. W. MARTIN, Circuit Judge.

*Clark & Williams*, for appellant.

*Hughes* and ———, *contra*.

L. R. & Ft. S. Ry. Co. vs. Barker and Wife.

ENGLISH, C. J. :

This action was commenced in the Circuit Court of Pulaski County, on August 14, 1875, by Emma O. Ammon against the Little Rock & Fort Smith Railway Company.

The complaint alleges, in substance, that on April 26, 1875, while the plaintiff's son, Alpheus D. Ammon, a child five years old, without discretion, and without any knowledge or negligence of the plaintiff, was playing on or near the track of the defendant corporation, in the town of Argenta, etc., the defendant, by its agents and servants, carelessly and negligently caused one of its locomotives, with a train of cars attached thereto, to approach said child with great and unusual speed, and then and there to pass rapidly over the track of said company, and negligently and carelessly omitted while so approaching said child to give any signal, by ringing the bell or sounding the steam whistle, in time for the child to be rescued from danger, or get from the track, and also negligently and carelessly omitted to stop said locomotive and cars, although it had ample time therefor before reaching said child. That by reason of said negligence of the defendant the said locomotive struck said child, ran over and crushed both his legs, and so severely bruised and lacerated them that it was necessary to amputate both of them, and in consequence of said injury said child suffered great and indescribable bodily pain, and died from said bruising and crushing about ten hours thereafter, on said April 26, 1875, before which time said child's father had died, whereby an action accrued to plaintiff, the mother of the child, against the railway company, and by which she has been damaged in the sum of $20,000, for which she prays judgment.

By an amendment to the complaint filed May 24, 1876, the plaintiff alleged that a part of said damages accruing to her as alleged in said complaint was a large amount of money necessarily paid out by her for the attendance of a physician, and

all funeral expenses attending the child's burial, amounting to —— dollars, and a part consisted in the loss of the services, companionship, and association destined to be rendered by said child to plaintiff.

The defendant filed an answer to the complaint, and on its application the venue was changed to the Circuit Court of Lonoke County.

In the Lonoke Circuit Court, September term, 1876, it appearing that the Clerk of Pulaski Circuit Court had failed to transmit the answer of defendant to the complaint, there was a consent order that defendant have leave to supply such answer, in short, upon the record, setting up contributory negligence on the part of plaintiff and her child, and denying negligence on the part of defendant.

The plaintiff having, since the institution of the suit, inter-married with F. B. Barker, on her motion he was joined with her as plaintiff.

The cause was submitted to a jury, and, after the evidence was introduced, the court gave thirteen instructions to the jury, on motion of plaintiffs, "to the giving of which instructions," the bill of exceptions states, "especially the 3d, 6th, 9th, 10th, 11th, 12th, and 13th, the defendant objected, and the court overruled its objection."

The defendant moved seven instructions, all of which the court gave.

The jury returned a verdict in favor of plaintiffs for $4,500 damages.

The defendant moved for a new trial, on the grounds:

1. The court erred in the rule of estimating damages, and in allowing funeral expenses to be estimated, and admitting evidence of such expenses.

2. The court erred in instructing the jury as moved by plaintiffs.

3. The damages assessed by the jury are excessive.

The court overruled the motion for a new trial, and rendered final judgment for plaintiffs in accordance with the verdict. The defendant took a bill of exceptions, setting out the evidence, instructions, etc., and appealed to this court.

I. By the common law the death of a human being could not be made the subject of a civil action. *Baker* v. *Bolton et al.*, 1 Camp. 493; Sedg. on Dam. (6th Ed.), 551, 694.

By section 1 of the act of February 3, 1875 (Acts of 1874–5, p. 133), "All railroads which are now or may hereafter be built and operated in whole or in part in this State, shall be responsible for all damages to persons and property done or caused by the running of trains in this State." (See sec. 12, art. 17, Const. of 1874; also, sec. 32, art. 5.)

By section 3 of same act, "When any adult person be killed by railroad trains running in this State, the husband may sue for damages to a wife. In all other cases the legal representative shall sue. If the adult be wounded, he may sue in his own name. When the person killed or wounded be a minor, the father, if living; if not, then the mother; if neither be living, then the guardian may sue for and recover such damages as the court or jury trying the case may assess."

In this case the mother sued the appellant railway corporation for damages for the negligent killing of her infant son, and she may unquestionably maintain such action under the above statute, though she could not by the common law.

II. The first and third grounds of the motion for a new trial present the kindred questions—what is the measure of damages in this action, and, were the damages assessed by the jury excessive? And in connection with these questions, the substance of the evidence relating to the subject of damages may be stated.

Mrs. Barker testified that she was living in Argenta (on the north side of the Arkansas River, opposite Litttle Rock), on

22

April 26, 1875, and that her son was killed on that day.   That in the morning, after breakfast, her servant asked her little son to go with her to the telegraph office.   He started out of the house with the servant, and she supposed had gone with her.   He was brought in in ten or fifteen minutes with both legs cut off near the knees.   It was Monday morning about ten o'clock.   She was then a widow, her husband being dead. The servant was trusty and careful.   The telegraph office was about 300 yards from her house.   Her house was about 75 yards from the railroad.   An old shop in the view would have prevented her from seeing the child at the place where the accident happened.   It was about 150 yards from her house to where the boy was killed.   He lived, after he was hurt, until about eight o'clock at night; Dr. Skipwith attended him.   He came within half an hour after the child was hurt.   Other physicians were called in.   They amputated the crushed leg just above the knee.   The other leg was cut off entirely, before. Her circumstances were limited ; had no property at the time. Kept boarders and supported her own house.   The only servant she kept was her cook.   Was not able to employ a nurse for the boy.   Her household business required her attention until after the housework was done.   She was sewing at the time the boy was brought in.   Was poor.   Her house was inclosed with a plank fence.   The child was killed on the Little Rock & Fort Smith Railroad.   She first called in Dr. Jones, and Dr. Skipwith brought in several others.

Plaintiff's counsel then asked witness as to the cost of funeral expenses, to which defendant objected, admitting that reasonable funeral expenses would be admissible.   The court decided that reasonable funeral expenses were such as the jury could allow, if defendant were liable at all, and that proof of such expenses was admissible, to which ruling defendant excepted.

Witness (Mrs. Barker) then stated that the medical expenses were $210, and that the funeral expenses did not exceed $90, and consisted of burial clothes, with coffin, carrying the child to Memphis by railroad, and there burying it with her relations. She hired three carriages in Memphis, in one of which she rode with the coffin.

The court instructed the jury that the railroad expenses would be disregarded, but when the witness was asked how much it cost, she said that she herself had a free pass, but did not know what the other items of funeral expenses or transportation were; that others paid it for her, and furnished the amount, which was $90.

To all of this testimony the defendant objected, but it was permitted to go to the jury with the qualification and exception above stated, to which defendant excepted.

Witness further testified that her child's health was good, and that she had no other child. That the services of the child at the time of his death were not much, but would have been her main support, had he lived. Would have been of service to her at ten years of age. He would have been of some service from the time of his death. Her house was inclosed with plank fence, and had a gate. She could have kept the child within the inclosure, and did do it when she thought it necessary. She had intermarried with Barker since she brought the suit.

Dr. E. H. Skipwith, witness for plaintiff, testified that he was called to see the child. It had been terribly mutilated. The only hope of saving it was to amputate both legs. One was crushed from the joint above the knee down. The other was cut off just below the knee, and so mangled that it was necessary to amputate both legs above the knees. Drs. Jones and Dodge were present and assisted in the operation. Witness first saw the child about nine o'clock, A. M. Had been a

regular practicing physician for fifteen years. The child died about eight or nine o'clock, P. M., that night. Its death was caused by prostration from loss of blood from the crushed limbs. He practiced in the family nearly a year. The child was a sprightly, robust child. The services of the child from its death until twenty-one years of age were worth $10,000. The bill of witness was $200 for amputation, not including medicine. The funeral expenses, he supposed, were worth $50.

### CROSS-EXAMINED FOR DEFENSE.

Q. How do you know what this child would have been worth?

A. I do not know exactly.

Q. Do you know much about it?

A. No, not much.

Q. Why do you then say that it is $10,000?

A. That is my idea under all the circumstances of this case, and that was the question I was asked.

Q. No difference about the question. I ask you now, what do you think it is worth in money?

A. I do not know exactly; perhaps you know more about it than I do.

Q. I am not swearing, you are the witness; what do you say?

No answer.

Q. Doctor, you have a step-son about twelve years old; what would you consider him worth—$10,000 from five to twenty-one?

A. Yes, I would; boys between twelve or sixteen and twenty are worth $75 or $80 per month.

Q. Is this not rather an unusual thing, and an extraordinary boy who will get it?

A. I suppose it is not ordinary.

L. R. & Ft. S. Ry. Co. vs. Barker and Wife.

Q. From fifteen to twenty-one is six years. Do you suppose a boy would, on an average, earn more than $720 a year from fifteen to twenty-one?

A. I think not.

Q. Would it not be an extraordinary case that he would earn that?

A. I think it would be extraordinary, but many boys are worth it, and some more.

Q. Would you not deduct from these earnings board and clothing?

A. Yes.

Q. How much?

A. I do not know exactly.

Q. Would $30 per month, or $360 per annum, be too much?

A. No, I think it would take that, at least.

Q. Doctor, taking $720 per annum as the best rates a boy can earn on an average for the last six years of his minority, as you say, it would amount to $4,370. Deduct six years' expenses at $360 per annum, making $2,160, and it leaves the net earnings $2,210 for the last six years.

A. I have not made the calculation; you say so.

Q. What do you say?

A. I do not know.

Q. Well, doctor, how much could the boy have earned between five and fourteen? Do you think it would have been $7,000 or $8,000, so as to make up your first rate of $10,000?

A. I do not know; he could work a good deal.

Q. Do you think a boy is capable of earning anything, under twelve years old?

A. It generally costs more to raise a child from five to twelve or fourteen than it can earn in that period. I have known children at five or six to earn good wages—$20 per

month—as cash-boys in stores, and as news-boys, in New Orleans.

Q. Are these not rare cases?

A. Very rare.

Q. Do you know of any at Little Rock?

A. No.

Q. Was your estimate of $10,000 based on any pecuniary calculation?

A. It was not, and I really know but little about it; in making my estimate I took into consideration that this was an only child, and considered the child as worth more on account of the relationship to its mother.

William Richardson, witness for plaintiff, testified that he did not know precisely what the child's services would have been worth. "After a child was ten or twelve years old, he would have been worth $25 or $30 per month; from seventeen or eighteen to twenty-one he would have been worth $75 or $80; from twelve to seventeen he would have been worth $60 to $70. From five to ten years old he was worth $8 or $10 per month, in excess of the expenses." The child was an intelligent, sprightly, well-grown, healthy, and perfect child of its age, had no natural infirmity, and big enough to run errands, bring chips and wood, and carry a small bucket of water.

On cross-examination, he stated that he was nineteen years old, and brother of Mrs. Barker, mother of the child. He got $35 per month when he was between twelve and fourteen. At fourteen he got $2 per day. Was now getting $1.50 per day, at nineteen years old. When he got $35 per month, his board cost him $18 per month, and about the same when he got $2 per day. He helped support himself and sister from the time he was twelve. She had a husband part of the time,

and when she was a widow she kept boarders, sewed and worked herself. His clothing cost him about $50 per year. No other expenses. His earnings were better than most boys. He would have felt satisfied had the child lived and done as well as he had.

Capt. W. C. Robinson, for defense, testified that a boy from five to twenty-one might be worth $100 per year, over and above expenses, and to a widowed mother double that sum; but he knew of no boy who was worth more than his living. He had raised one to eighteen years of age, and did not consider him worth more. He would not take an ordinary boy until twenty-one for his services; he might be worth $100 per year and board and clothing; to a mother, double that sum.

The seven instructions which the court below gave to the jury on the motion of appellant, all relate to the subject of negligence on the part of the servants of appellant, and contributory negligence on the part of the plaintiff mother, and her child. None of them relate to the subject of damages, and appellant asked no charge on that subject. So all of the instructions given by the court at the instance of appellees, except the tenth, relate to the subject of negligence.

The tenth follows:

"If the jury find for the plaintiff, they may assess damages for not only the medical attendance upon, and nursing of the deceased before death, and reasonable funeral expenses after death, but such other pecuniary damages as, under all the circumstances proven, they may consider reasonable."

In this country, under statutes similar to ours, as well as in England under Lord Campbell's Act (9 and 10 Vict., ch. 93), the ground of recovery must be something beside an injury to the feelings and affections, or a loss of the pleasure and comfort of the society of the person killed; there must be a loss to the claimant that is capable of being measured by a pecun-

iary standard. Exemplary damages are, therefore, not to be recovered unless the statute expressly, or by implication, allows them, as in some instances (California, for example : *Meyers* v. *City of San Francisco*, 42 Cal. 217) it does. But in estimating damages, some departure from the standards applied in other cases is essential, as otherwise, in some cases, no recovery could be had at all, though the statute plainly gives the action. If a parent sues for the killing of a minor child who is yet too young to render service, it is manifest that for the time being there could be no pecuniary loss whatever ; and whether the child, if living, would ever become serviceable, must be matter for speculation only. Yet, as the statute plainly gives the right of action for the benefit of the parent, without restriction as to circumstances, but manifestly assumes that there is some injury in every case, the right to recover in these cases must be deemed unquestionable. Cooley on Torts, 272.

The damages are not to be given as a *solatium*, but must be founded on pecuniary loss, actual or expected ; and mere injury to feelings can not be considered. *Ib.* 473, and cases cited ; Sedg. on Dam. (6th Ed.), 696 and notes.

The statute giving the mother, the father being dead, the right to sue appellant for damages sustained by her by reason of the killing of her infant child, any necessary expenses incurred by her for nursing and medical attendance before its death, and for burial expenses afterwards, were proper elements of estimate by the jury in making up the damages to be awarded to her, if they found the appellant corporation guilty of the negligence imputed to it in the complaint. *Pennsylvania R. R. Co.* v. *Barton*, 54 Pa. St. 496 ; *Cleveland & Pittsburg R. R. Co.* v. *Rowan*, 66 Pa. St. 399.

The value of the services of the child, lost to the mother by the death of the child, was also a legitimate element to be esti-

mated by the jury in making up their verdict upon the question of damages.

The statute prescribes no rule for estimating such damages, but the construction which has been given to similar statutes by the courts must furnish the guide. Nor does our statute limit the amount of the recovery, as the statutes of some of the States do, but juries are not warranted in finding verdicts for sums disproportionate to, or in excess of, the probable pecuniary loss of the parent, occasioned by the death of a child. Reasonable damages only, in view of all of the circumstances in evidence, should be awarded. *Pennsylvania R. R. Co.* v. *Barton, supra.*

We find no substantial error in the ruling of the court below in relation to the admission of evidence of funeral expenses, nor in giving the tenth instruction, above copied, as far as it goes.

Counsel for appellant submit that the damages allowed by the statute to the mother for the killing of her child are such only as the child would have recovered at the moment of its death, and that nothing can be awarded to her for the loss of after-service ; that the loss of service in this case must be limited to the period that intervened between the time the injury was inflicted upon the child and its death, which was ten hours. If this be true, had the child been killed instantly, the mother could have recovered nothing but such expenses as she necessarily incurred in the burial of the child, and this construction of the statute would render it nugatory.

Counsel also submit that no loss of after-service is alleged in the complaint, and that therefore there could be no recovery for such loss, citing *Gilligan* v. *New York & Harlem R. R. Co.*, 1 E. D. Smith, 461.

It is true that in the original complaint there is no allegation of loss of service, or special damages by reason of expenses.

incurred; but in the amendment to the complaint the plaintiff claims damages for money necessarily expended for medical attendance and in the burial of the child, and also for loss of the *services*, companionship, and association destined to be rendered by the child to the plaintiff.

For the loss of the companionship and association of the child, and for the grief of the mother on account of its death, the statutes, interpreted in the light of judicial decisions upon like statutes, afford the bereaved mother no compensation. Such loss and such grief would be difficult to measure and can not be compensated by money; and the court below, in its charge to the jury, should have so declared the law to be.

We close this branch of the case by announcing our conclusion, that when a mother sues a railway corporation under the statute for the negligent killing of her infant child, the *measure of damages* is the expense necessarily incurred by her for medical attendance, nursing, and burial of the child, and reasonable compensation for the loss of the probable services of the child during the period of its minority, difficult as it may be to estimate the value of such loss.

III. We will next endeavor to determine whether the damages awarded by the verdict in this case are excessive.

The jury fixed the damages at $4,500. The plaintiff mother testified that the medical expenses were $210. She thought proper to take the child to Memphis and there bury it with her relations, and the whole of the funeral expenses, including transportation, did not.exceed $90. The court instructed the jury that railroad expenses would be disregarded, and she then stated that others paid the funeral expenses for her. Whether they were paid as a gratuity, or the persons paying them looked to her for reimbursement, she did not state. Dr. Skipwith valued the funeral expenses at $50, and it may be supposed that the jury allowed that much under the charge of the

court. Adding the medical bill and funeral expenses together, making $260, and deducting that from $4,500, the whole sum allowed by the verdict, and it leaves $4,240, as awarded for the loss of service.

The child was five years old when killed and sixteen years under majority. The verdict gave the mother (and her second husband) $265 for each year, or $22.08 for each month, or 84 cents and 6 mills for every work day during the whole period of its minority, making no deduction for boarding, clothing, education, loss of time, expense of sickness, and assuming that the child would have lived, and served its mother until it was of age.

In *City of Chicago* v. *Major*, 18 Ill., 349, the suit was by the father as administrator of a child four years old, which fell into a water-tank constructed by the city, and was drowned, and its death was alleged to have been caused by the negligence of the city. The jury rendered a verdict for $800 damages. The court held that the father could maintain the action, under an Illinois statute, as administrator of the child, and said: "The rule is that the plaintiff's damages must only be estimated for pecuniary loss suffered by the death of the deceased, without taking into account the mental anguish or bereaved affections, and the jury must make their estimate of such pecuniary damage from the facts proved, and that it was not necessary that any witness should have expressed an opinion of the amount of such pecuniary loss. In this case, as in all others, it was proper for the jury to exercise their own judgment upon the facts in proof, by connecting them with their own knowledge and experience, which they are supposed to possess in common with the generality of mankind. It is only when witnesses are supposed to possess a skill and judgment superior to the generality of mankind upon a particular subject that their opinions are allowed to go to

the jury, for the purpose of supplying the supposed want of experience and judgment of the jury. Where such aids are not attainable or are not produced, then the jury must be guided by their own best judgment, applied to the facts in proof, for the purpose of arriving at a conclusion.''

The court refused to set aside the verdict on the ground that the damages assessed were excessive.

In *Louisville & Nashville Railroad Co.* v. *Connor, Adm'r'x*, 3 Heiskill (Tenn.), the mother sued, under a Tennessee statute, as administratrix of her infant child, eighteen months of age, which was run over and killed by a train of cars on defendant's road; the jury assessed the damages at $3,000 and the court below refused to grant a new trial. On appeal the judgment was affirmed, the court passing upon questions of law relating to negligence, etc., but saying nothing as to the amount of damages awarded by the jury,

In *City of Chicago* v. *Scholten*, 75 Ill., 469, the father, as administrator of his deceased son, sued the city, under a statute, for causing the death of his son, twelve years of age, through negligence in respect to the side-walks of the city, and the jury gave a verdict for $2,833.33, and the city appealed. The court below instructed the jury that if they found that the city had been negligent, etc., they had '' a right to find for plaintiff and should assess the damages at such sum as will, in the judgment of the jury, compensate the plaintiff, and those in whose interest he sues, for the loss of deceased.'' Mr. Justice Scott, delivering the opinion of the Supreme Court, said: '' Where the next of kin are collateral kindred of the deceased and have not received pecuniary aid from him, proof of such relationship would warrant a recovery of nominal damages only; but when the deceased is a minor and leaves a father, entitled to his services, the law presumes there has been a pecuniary loss for which compensation, under the

statute, may be given. In such cases the pecuniary loss may be estimated from the facts proven, in connection with the knowledge and experience possessed by all persons in relation to matters of common observation. No doubt the damages could be greatly enhanced by proof of the personal character-istics of the deceased. Evidence of mental and physical ca-pacity to be of service to his father in his business, his habits of industry and sobriety, where the deceased is old enough to have established a character, are elements to be considered in assessing the pecuniary loss. But the instruction may be lia-ble to a just criticism because of its ambiguity as to the nature of the damages the jury were at liberty to award. It should have contained some words of limitation that would have ex-pressly restricted the damages plaintiff might recover, to the pecuniary injury sustained. No other damages are recover-able under this statute. The court should have added the qualification indicated. In its present form, it stated the rule as to damages recoverable in such actions, too broadly, and may have made the impression damages could be awarded for bereavement and by way of solace for the affliction suffered. Such is not the law."

The judgment was reversed.

It has been held that when the suit is brought for the bene-fit of the mother, an award so large that the interest upon it would exceed all the probable earnings of her son, is mani-festly greater than the pecuniary loss could possibly be, when it appears that the deceased was without property or other ex-pectations. *Cooley on Torts*, 274; *Chicago R. R. Co.* v. *Bayfield*, 37 Mich., 205; *Rose* v. *Des Moines Valley R. Co.*, 39 Iowa, 254.

In this State it is allowable and customary to loan money at ten per cent conventional interest. The sum of $4,240, awarded the mother for loss of services of her son in this case,

would, if safely invested at such rate, yield the mother an annual income of $424, not only for each year of her child's minority, but for after years, when, if it had lived, it would cease to owe her service.

In *Rose* v. *Des Moines Valley R. Co.*, *supra*, the subject of the action was the killing of an unmarried man, twenty-four years of age, by occupation a harness-maker, whose expectancy of life was thirty-eight years. It was proved that he was a man of temperate and industrious habits, and that his net earning at the time of his death was $263.11, annually. The action was brought by his administrator for the benefit of his estate, and the jury awarded $10,000 damages. On appeal the Supreme Court held the damages excessive on the logic that one-half the sum awarded, at six per cent interest would produce annually, a net income greater than that earned by the deceased, and at ten per cent (the customary rate in Iowa), would produce annually nearly double the sum that he would annually earn during the expectancy of life, and the court refused to affirm the judgment unless the plaintiff would enter a remittitur for $5,000.

In this case the mother had a claim upon the earnings of her child for sixteen years. At the time of its death it was earning nothing, and would probably, if it had lived, earned her but little over and above its support for half the remaining years of its minority; and yet the jury gave her $265 for each of the sixteen years, a larger sum than the net annual earnings of the unfortunate Iowa harness-maker; and the Supreme Court of that State would allow his administrator but $5,000 upon an expectancy of manhood life of thirty-eight years, when here the jury awarded the mother $4,240 upon an expectancy of sixteen years of the minority life of her son.

In *Allen* v. *Atlanta Street Railroad Co.*, 54 Georgia, 501, it was decided that a father could not maintain an action for

L. R. & Ft. S. Ry. Co. vs. Barker and Wife.

damages on account of the homicide of his infant child, which was, at the time of its death, incapable of rendering him any service (the child was two years old); that there could be no recovery for loss of future services.

Such a construction of our statute would render it of no effect. If the minor is capable of service when killed, there is no loss to the father or mother for past services, for he or she has received them to the time of the killing, and if there can be no recovery for loss of probable future services, there can be no recovery at all, and the statute which gives the right of action would be worthless.

In *Cleveland & Pittsburg R. R. Co.* v. *Rowan*, 66 Penn., 395, Rowan and wife sued the company for killing a son of the wife, eighteen years old. The court below instructed the jury that if defendant was guilty of gross negligence in reckless running of the train by which the son was killed, they might award exemplary damages. The jury awarded $2,372.93. The Supreme Court held that this instruction was erroneous, that under the statute, pecuniary and not exemplary damages by way of punishment, was allowable. That the pecuniary value of the services of the son during minority was the measure of damages, which the jury must discover and determine from all the evidence, etc. The judgment was reversed for error in the instruction.

Railroad agents may be punished criminally for gross negligence, resulting in death.

In *Pennsylvania R. R. Co.* v. *Barton*, *supra*, the mother, a widow, sued for the killing of her son, thirteen or fourteen years of age, and the jury gave her $1,748, and, on error, the Supreme Court affirmed the judgment.

In slavery times, for some years before the civil war, a boy five years old would not have sold for more than $500, and the purchaser would have acquired a legal right to his services for life.

A good-looking young man would sell for $1,500 to $1,800; the price was fixed by the common judgment of experienced men, in reference to the value of the probable services of the man, over and above expenses for life.   Mechanics and skilled laborers were more valuable than ordinary hands, and age, health, intelligence, habits, etc., were considered in estimating values.

Reference is made to estimates put upon the value of slave labor for illustration only.   We would not say that the services of a child to a mother, prompted by duty and affection, are not more valuable than services rendered by compulsion, nor that services stimulated by fair compensation are not more valuable than involuntary services rendered for mere maintenance.   Nor do we mean here to enter into a comparison of the relative value of the services of persons of different races; the true value of human labor must be estimated by considering all circumstances and conditions attending it.

In this case the mother was a widow, poor, and kept a boarding house for a living.   The son, her only child, was five years old when killed.   He was intelligent, healthy, and promising. If he had lived, and remained obedient to his mother until he was of age, his services would have increased in value as he advanced in years.   If given no education, he would have earned for her the wages of ordinary labor only.   If sent to school or apprenticed to fit him for skilled employment, expense and loss of time would have followed.

An impartial jury, of sound judgment and experience, properly instructed as to the measure of damages by the court, would consider all the facts, circumstances and contingences in fixing a reasonable value upon the probable services lost to the mother by his death.

The opinions of the witnesses in this case are of no great value.   Dr. Skipwith, who was the family physician and manifestly in sympathy with the bereaved mother, at the outset

lumped the value of the child's services from five to twenty-one years at $10,000. It was drawn from him on cross-examination that his estimate was not based upon any pecuniary calculation. He could not be made to figure up the value of the services, without putting rare instances, at more than $2,210.

Wm. Richardson, the brother of the mother and uncle of the child, was only nineteen years of age, and could have had no experience in the raising of boys to the age of twenty-one years, and he had not lived long enough to make his observation of much value. He undertook to estimate the monthly value of a child's services, in excess of expenses, from five to twenty-one years of age, and run it up from $8 to $80 per month, without making any allowance for loss of time, or expense in schooling or apprenticeship to fit the boy for skilled employment, and an increase of wages over such as ordinary labor commands.

At the time he testified he was getting $1.50 per day, which was equal to $39 per month, allowing twenty-six work days to the month. He paid $18 per month for board, and $50 a year for clothing, which was a little over $4 per month. His expenses then were $22 per month, and his wages $39, leaving him a net monthly earning of $17.

The jury gave the mother of the child $22.08 for each month of the sixteen years of its minority.

Capt. Robinson's experience and observation in the raising of boys had not impressed him that it was a profitable business. A boy might be worth $100 per annum over and above his board and clothing, and to a widowed mother double that sum. If this be true, the verdict of the jury should not have been more than $3,200 for loss of service.

We are satisfied that if the facts of the case were submitted to one hundred impartial men, of sound, discriminating judg-

ment, of experience and observation in the raising of children, properly instructed in the law as to the measure of damages, ninety-nine, if not all of them, would say that the damages awarded in this case for loss of probable service were excessive, and such is our judgment.

IV. As to negligence.

Counsel for appellant submit that the killing of the child, under the circumstances disclosed by the witnesses, was an unavoidable accident ; that the agents of appellant were guilty of no culpable negligence, and that upon all of the evidence introduced the court below should have instructed the jury to find for appellant, and that this court should reverse the judgment for its failure to do so.

The court below gave all of the instructions moved for appellant. It was not asked to declare, as matter of law, that there was no evidence on which the jury could find a verdict in favor of plaintiff ; and, if such an instruction had been moved, the court could not have given it without encroaching upon the province of the jury, if there was any evidence tending to prove the issue on the part of the plaintiffs.

Nor did appellant, in the motion for a new trial, ask the court to set aside the verdict on the ground that there was no evidence to support it, or that it was contrary to the evidence— the ground taken in the motion being that the damages awarded by the verdict were excessive. In other words, appellant did not object, in the motion for a new trial, that plaintiffs were not entitled to any verdict upon the evidence, but that the verdict was for too large a sum ; and that ground we have considered above.

We deem it unnecessary, therefore, to notice the evidence relating to the question of negligence further than it may be necessary to do so in considering such of the instructions given

for appellees as were specifically objected to by appellant, disregarding the general objection made to the thirteen instructions in mass.

The special objection was to the third, sixth, ninth, tenth, eleventh, twelfth and thirteenth. The tenth related to the measure of damages, and we have considered it above.

On the morning of April 25, 1875, at the usual time, the train, consisting of locomotive, tender, baggage car and passenger coach, about one hundred and thirty-five feet in its entire length, was starting from Argenta to Fort Smith, moving at the usual speed in starting out, and the child in question, unattended by mother or nurse, got on to the track in front of the train, when it was passing through the yard of the machine shops of appellant, and was run over by the locomotive before the train was stopped. The engineer saw the child when it got on to the track, and whether he could have stopped the train before it struck the child, by the diligent use of means within his control, or was guilty of culpable negligence in not doing so, was a question mooted before the jury on the evidence. The witnesses differ about the distance between the child and the front of the train when it got on to the track; one witness said 250 feet, another 75 yards, the engineer 40 yards, another witness 50 feet, and another 150 feet, etc. The witnesses agree that immediately upon the child getting upon the track, the steam whistle sounded down brakes, and the engine was reversed. The bell was also ringing. The child had been seen frequently playing about the premises and the skiff landing on the river, and one witness had expressed the apprehension that the "little devil" (to use his language), would some day be killed.

The third instruction given for plaintiffs is as follows:

"Contributory negligence cannot be imputed to a child of

tender years, and if the jury believe from the evidence that Alpheus D. Ammon, deceased, who is alleged to have been killed by the defendant's cars or locomotive, was only a little over five years of age, they will consider him as having been responsible only for that degree of care and diligence which would naturally and reasonably be expected of such a child of that age.''

This instruction is substantially in harmony with the rule laid down by the Supreme Court of the United States in *Railroad Company* v. *Stout*, 17 Wallace, 660, and approved by Mr. Wharton, upon a review of authorities, in his work on Negligence, sec. 315.

The court, by JUSTICE HUNT, said : '' It is well settled that the conduct of an infant of tender years is not to be adjudged by the same rule which governs that of an adult. While it is the general rule in regard to an adult, that to entitle him to recover damages for an injury resulting from the fault or negligence of another, he must have himself been free from fault ; such is not the rule in regard to an infant of tender years. The care and caution of a child is according to his maturity and capacity only and this is to be determined in each case by the circumstances of that case.'' See also *Railroad Company* v. *Gladman*, 15 Wallace, 401.

The sixth instruction :

'' Railroad companies, owing to the dangerous character of the business they engage in, are held to the greater care in the operation of their machinery and machines, especially in running through towns ; and if the jury find from the evidence that the defendant's agents or servants, in running the locomotive or other machinery, failed to use such care or caution, they will find for the plaintiff ; if they further find from the evidence that the son of plaintiff, Emma O., was killed by the

defendant's engine when the killing might have been prevented by the use of such diligence, if killed in town and without negligence of the mother or child being the proximate cause.''

This instruction is substantially in the language of one approved by the Supreme Court of Missouri in *Brown* v. *Hannibal & St. Joseph R. R. Co.*, 50 Mo., 465, and we see no valid objection to it.

The ninth instruction:

"If the jury believe from the evidence that the plaintiff, the mother of the child was in fault, and that the child, while wrongfully on defendant's track was killed by defendant's engine or cars, but that defendant's agents were aware, or by the use of ordinary diligence, might have been aware of the fact that the child was on the track in time to avoid injuring him, by reasonable diligence, the failure to use such diligence alone must be considered the proximate cause of the injury.''

We think the last clause of this instruction, construed with its context, is not subject to the objection that it assumes negligence on the part of the agents in charge of the train. Several of them swore that every exertion was used to stop the train and save the child when it got on the track, and this was a question of fact for the jury.

The rule of law expressed in the instruction is supported by authority. *Evansville & Crawfordsville R. R. Co.* v. *Hiatt*, 17 Ind., 102. *State* v, *Railroad*, 52 New Hamp., 528.

The eleventh instruction:

"If the jury believe from the evidence that the son of plaintiff, Emma O., was killed by defendant's locomotive or cars, while on defendant's track, and that defendant's employes in charge of the locomotive or cars might, by ordinary care and skill, have perceived him in time to avoid injuring him, a failure to recognize the child and stop the train before running upon and injuring him, will make defendant liable, even though

those having the child in charge may have been negligent in permitting him to go upon the railroad.''

We do not see why this instruction was given. It appears from the evidence that the engineer saw the child before and at the moment he got on the track, and sounded down brakes, etc. If there had been evidence that the child was on the track before the engineer saw him, and that he might have seen him if he had been on the lookout, and stopped the train before it reached him, the instruction might have been appropriate. See *Louisville & Nashville Railroad* v. *Connor, Adm'rx*, 9 Heiskill, 19.

There was no evidence that the child was in the immediate charge of any person when it got on the track. Its mother was at home. It left the house to go with the servant to the telegraph office, but when it got into the yard it refused to go, and the servant left it there. After she had gone, it seems that it went upon the railroad premises of its own will, unaccompanied, and was playing there.

The real question before the jury was whether the train was properly manned, and whether it could have been stopped in time to save the child after it got on the track, by such prompt and diligent use of its appliances as the emergency required. All of the witnesses agree that the child had plenty of time to get from the track after the sounding of the alarm-whistle, etc., before the train reached it, but it seems to have become confused. One witness thought the train might have been stopped by the time it moved a distance equal to its length, and before it reached the child. Others disagreed with him. We express no opinion on the subject, nor do we deem it necessary to state all of the facts disclosed by the bill of exceptions which bear on the question. We only state so much of the evidence as is deemed necessary in order to pass upon the instructions complained of.

In basing an instruction on hypothetical facts, disputed facts ought not to be assumed to be true, nor should facts be stated hypothetically which do not appear in evidence. Such an instruction might mislead the jury.

The twelfth instruction :

" If the jury find from the evidence that the engineer in charge of the engine on defendant's road at Argenta, on the 26th day of April, 1875, saw or might, by the use of ordinary care and caution, have seen the plaintiff's child approaching the railroad track, and very near the same, and had reasonable ground to believe it was going upon the track, in time, by the use of ordinary care and diligence, to have stopped the train before reaching the point when the child was approaching, it was the duty of the engineer to have at least checked said train so as to have had it under control, and if he failed to do so, and the jury find that the child, by such failure, was run over and killed by the engine, the railroad company are liable in damages."

If the evidence before the jury warranted them in finding to be true the facts stated hypothetically in this instruction, the legal conclusion thereupon might have been as announced.

The thirteenth instruction :

" If the jury believe from the evidence that plaintiff had taken reasonable precaution to restrain her child and guard it against damage, reference being had to all the surrounding circumstances, including the parent's condition in life, and that the child escaped and went upon the defendant's railroad track, and was injured by the negligence of the defendant's agents, servants or employes, no negligence can be imputed to the plaintiff ; and if the child exercised ordinary care for one of his years and capacity, no blame attaches to him ; and if, on account of his tender years, the child was incapable of exercising any care or discretion, none could be required of him."

If the mother was blameless of contributory negligence, the fact that a child below the age of discretion got recklessly upon the railroad track, in front of the train would not excuse appellant from liability, if by the negligence of its agents in the management of the train it was run over and killed. But it would be otherwise if the killing of the child could not be avoided by diligence on the part of such agents. Wharton on Negligence, secs. 309–314; Cooley on Torts, 680–3.

Upon the whole the instructions given for appellees, to which appellant particularly objects, with the exceptions indicated above, were well enough when considered in connection with the seven instructions given for appellant relating to negligence and contributory negligence, to which no objection was made by appellees.

The judgment must be reversed, and the cause remanded for a new trial.