ANNIE MOORE v. GREAT NORTHERN RAILWAY COMPANY.[1]

February 3, 1897.

Nos. 10,243—(223).

**Railway—Injury to Employé—Negligence of Master.**

In this action, which was brought against a railroad company to recover damages for the killing of plaintiff's intestate, a yard switchman, it is *held* that, upon the facts as shown upon the trial and conceded by both parties, the plaintiff failed to prove any negligent act upon defendant's part upon which to sustain a verdict in her favor.

**Same—Disregard of Custom.**

When it is established, upon the trial of a case, that a custom in regard to the operation of trains, designed for the protection of employés, has been unobserved and disregarded, but it appears conclusively that an observance of the custom would have been of no service or value in the particular case, a verdict for damages cannot be based solely on the failure to observe this custom.

Action in the district court for Hennepin county. The case was tried before Pond, J., and a jury, which rendered a verdict in favor of plaintiff for $4,166.67. A motion on the part of defendant for judgment notwithstanding the verdict was denied, and from a judgment entered pursuant to the verdict defendant appealed. Reversed.

*W. E. Dodge,* for appellant.

*Chas. G. Laybourn* and *F. D. Larrabee,* for respondent.

[1] Reported in 69 N. W. 1103.

COLLINS, J.  The plaintiff's intestate, while in defendant's employ as a day switchman in its Minneapolis yard, was killed by a train, and this action was brought, under the statute,[2] to recover damages for such killing.

The yard in question consisted of five parallel tracks, 14 feet apart from center to center, extending in an easterly and westerly direction.  The northerly track, extending from the westerly end of the yard in an easterly direction, was a side track used for storage and transfer purposes.  The next, on the south, was known as the "mill lead" track, and used for making up strings of cars, and for transferring.  South of this was the east-bound passenger track, and south of this was the west-bound passenger track, while on the extreme south was that known as the "Minneapolis Western."  Just south of this yard was that of the Chicago, Milwaukee & St. Paul Company, from the tracks of which was a transfer or switching track, which led to and across all of the defendant's tracks, except the one on the extreme north.  This track was used exclusively for transferring freight cars from one yard to the other, or from one track to another in defendant's yard; and on the north side of all of defendant's tracks, just about opposite where the switch connected with the Minneapolis Western track, was the usual switch house.  The westerly end of the yard was more than 1,500 feet west of the switch house, and a semaphore, with a stationary light, was located at this west end, not far from the switch whereby cars were transferred from the mill lead track to the one, upon the north of it, used for storage and transfer purposes.  These tracks were all sunk below the natural surface of the ground, and near the west end of the yard was an overhead iron bridge, upon University avenue, while easterly, a little more than 300 feet, were two overhead bridges of iron, —one on Fourth street, the other on Fifteenth avenue.

The deceased was an experienced man, and at the time of his death had been in defendant's employ as a switchman in this yard for about five years.  About half past five in the afternoon on the day in question, one of defendant's switching locomotives, with 21 freight cars and the usual switching crew, came from the direction of the other yard upon the transfer track, and were stopped south of the southerly switch until an east-bound passenger train had

[2] G. S. 1894, § 5913.

passed. · Plaintiff's intestate, Moore, then crossed the yard from the switch house, and in succession opened all of the switches on the transfer, so that the locomotive and cars finally reached the mill lead track, and thence proceeded westerly until the locomotive passed the switch connecting the track last mentioned with the one north of it. Here the locomotive was uncoupled from the cars, went upon the track last mentioned, was attached to other cars, and, pulling back upon the mill lead track, proceeded to make up the train with the cars brought from the other yard in the rear. This brought two furniture cars on the rear end, each 13 feet 5 inches high from the top of the rails to the running board,—so high, in fact, that the distance between the running boards and the beams of the overhead bridges, when the cars were passing underneath, was about $3\frac{1}{2}$ feet. It was, of course, impossible for a brakeman to stand on the top of one of these cars and pass under the bridges in safety.

After making up the train, it was backed easterly along the mill lead track,—the furniture cars in front,—to a point east of the switch house, and, soon after it had passed, the lifeless body of Moore was found lying between the rails, a few feet east of the point where the transfer connected with the mill lead track. No one witnessed the casualty, but it was shown that, after Moore switched the locomotive and cars upon the mill lead track, and they had proceeded westerly, he set the switches for through trains, then went to the switch house, procured lights, and set one upon each of the switches on the transfer track. His duty was, then, to walk westerly to the semaphore, light the stationary lamp, and return to the switch house. This he could do without crossing a track. From all of the circumstances which appeared in evidence, it is safe to conclude that, after setting out the light at the switch, where the transfer track connected with the mill lead track, Moore walked westerly towards the semaphore, for some reason stepped upon the track on which the locomotive was backing the cars, was struck by the one in front and knocked down, and that his body was then dragged easterly, along the track, a few feet, to the point where it was found.

It was shown that, at or about the time the locomotive engineer started to back up, under orders from the foreman of the switching

crew, a passenger train passed by upon the east-bound track, running at about 25 miles an hour, and that the locomotive of this train was emitting at this time a large volume of dense, black smoke, which settled under the bridges and upon the ground, from the west end of the yard to a point east of where Moore's body was found.    This train was upon its regular schedule time, and, of course, Moore knew that it was then due.    The switch locomotive, with any cars which might be attached, ran irregularly, and this must also have been known by him.    In an amendment to the complaint, made upon the trial, it was alleged that this smoke was in such quantities as to completely obscure a view of the train, which ran over the deceased soon after it started backward, and so completely filled the excavation in which the tracks were that it "entirely obscured the view of any object in said" excavation.    And the evidence justifies the statement that, although it was in the daytime, the settling smoke made it intensely dark under the bridges, and for some distance easterly thereof, after the passenger train passed, and until the smoke lifted from the ground.    In fact, while it was usual for the smoke to collect and settle in this locality, it was much more than ordinarily dense on this occasion,—so dense, according to the evidence, as to fully confirm the allegation referred to that the smoke "entirely obscured the view of any object" in the excavation.

Counsel for appellant railway company urges that the evidence wholly failed to show any act of negligence upon the part of his client upon which the verdict can be sustained, and also, that it conclusively established such contributory negligence upon the part of Moore as would preclude recovery.    It is to the first of these claims that we shall now address our investigation.

The wrongful acts and omissions on defendant's part, on which plaintiff relied, as stated in plaintiff's complaint, were three in number, and on the trial two of these were necessarily abandoned.    The third was that it was usual and customary, in the operation of switching or transfer trains in this yard, to station a brakeman upon the car which was brought in front by the backward movement to give warning of the approach of the backing train, and that in this instance the defendant failed and neglected so to station a brakeman, or to provide any light or signal upon such car, whereby warning

of the approaching train might be given.   To these allegations in respect to defendant's acts of negligence was added, on the trial, the act specified in the amendment to the complaint; and the acts relied upon on this appeal can best be stated by a quotation from the brief of one of respondent's counsel as follows:

"My position is that some of the members of said transfer crew were negligent in at least two respects:   First, in starting said transfer train eastward over the transfer track without a man being upon the rear car, or head car, as the same was pushed; and, second, in starting the same at the time they did, when the train was entirely obscured from view by the smoke, and its whole passageway to the point where the deceased had a right to be also obscured."

So that we have to consider whether the evidence tended to show that it was negligence to start or move the train on account of the prevailing conditions caused by the smoke, or negligence, under the circumstances, to start or run the train easterly through the yard without having a brakeman stationed upon the leading furniture car. No other acts of negligence, either of omission or commission, are relied upon; and right here we call attention to some matters which affirmatively appeared upon the trial, or are matters necessarily to be inferred from what did appear.

At the time the foreman gave his moving orders, and his train started easterly, the locomotive of the passenger train was about opposite that used for switching, and both were westerly of the bridges.   The smoke had not then reached these bridges, and consequently had not settled upon the ground, or affected the opportunity to see or be seen.   The dense condition came after the train moved.   Conroy, the rear brakeman, was not on the furniture cars when they started, but on a car nearer the locomotive.   He testified that, as the train moved, he walked along the top until he came to the first of the two furniture cars, and then stopped, because of the density of the smoke, and because he realized that, while going under the bridges, a man could not stand upon the top of a car of this character.   He remained at that point until he could see to proceed, after the smoke lifted a little, and then, satisfied that the bridges had been passed, went on until he reached the forward end of the train as it was then running.   This was after the furniture cars had passed the point where Moore's body was found, and, undoubtedly, after he had been stricken down.   And evidently it was

as soon as the cars had emerged from the smoke, and about as soon as a brakeman's presence at that particular station upon the train would have been of the slightest service to any person upon the mill lead track.

For convenience, we shall first consider the contention of counsel that the train should not have been started at the time it was, and should not have been moved while the smoke was so dense as to obscure the vision of those in charge, or to prevent other employés engaged about the yard from observing its approach.

When the foreman of the switching crew gave the order to back the train, and when it actually started, the smoke had not settled down, for the locomotive from which it came had not yet reached the bridges. Nor could the foreman anticipate that a greater or denser volume would settle there than was an everyday occurrence. And if he could have foreseen this, upon what hypothesis, or upon what evidence in the case, can it be maintained that it was negligence, either to start the train, or to keep it moving after it had started. Trains belonging to defendant and other companies passed through this yard every few minutes, many at a high rate of speed. There were no grade crossings on which to catch the traveler upon the public ways, and none but employés in the yard itself could be expected to be there; and they assumed the ordinary risks incident to the employment. There was no evidence that it had ever been the custom in this or any other yard to stop the operations of trains when smoke made them invisible, or obscured the vision so that objects upon the tracks could not be seen by the employés. In fact, it would paralyze the business of railroading if trains were to be stopped under such conditions. And this is especially true with reference to this particular yard, where, as we have seen, the smoke settled upon the tracks almost continuously as the trains went by. There was no evidence in the case upon which to base a verdict that there was negligence in starting or moving this train solely because of the atmospheric conditions.

This brings us to a consideration of the contention that defendant was negligent, and the verdict must stand, because no brakeman was stationed upon the front end of the leading furniture car; and this must be passed upon with reference to the plaintiff's positive

allegation, in the amended complaint, conclusively supported by the proofs, and relied upon by plaintiff's counsel, that it was so dark, under the bridges and easterly, beyond where Moore's body was found, that the train could not be seen as it moved, nor could any object upon the ground be seen by the operatives of the train, including, of course, a brakeman upon the furniture car, had there been one there.

Although it was emphatically denied on the trial by defendant's witnesses, there was evidence, produced by plaintiff, tending to show that it was the custom, when backing trains in this yard, to have a brakeman upon the leading car; one of his duties being to watch out for pedestrians along the tracks, and to warn them of the danger.

But, assuming this to have been the custom, of what value to Moore would have been a compliance with this custom? Or what service could a brakeman, stationed upon the top of the approaching car, have rendered him as the train backed down through smoke which so completely enveloped every object that all were invisible? The brakeman could not have seen Moore upon the track, and, consequently, could not have warned him of the danger. Although walking towards it, Moore could not, and evidently did not, see the train in time to escape. He had probably stepped over on the mill lead track to avoid the passenger train, and was walking there in the intense darkness. Taking the uncontroverted evidence as to the circumstances and conditions, how can it be said that it was negligence to back the train without stationing a man upon the furniture car to look out for persons on the track, or that the failure to have a brakeman in that place caused Moore's death? A score of men upon the car would have been of no service to him so long as they depended upon their eyesight alone, and nothing but a light sufficiently large to penetrate the gloom, or a noise which would have reached his ears and notified him of the coming train, would have given him an opportunity to escape. The absence of the brakeman from the car, the disregard of the alleged custom, did not operate in any degree to the result. The presence of a brakeman there, and a strict observance of the custom, would not have afforded the slightest protection to the unfortunate man. His death was one of

the distressing casualties which will come to those employed in the extremely hazardous business of yard switching, although every known precaution be taken.

It seems to us that, from the evidence, it conclusively appeared that the failure to observe the custom we have referred to did not contribute to or cause the accident. When it is established, upon the trial of a case, that a custom in regard to the operation of trains, designed for the protection of employés, has been unobserved and disregarded, but it appears conclusively that an observance of the custom would have been of no service or value in the particular case, a verdict for damages cannot be based solely on the failure to observe this custom.

But counsel have urged that, as it was the custom to station a brakeman on the leading car before starting to back, Moore, looking that way, and seeing no one in the usual place, would have the right to presume that the train was not ready, and would not start, and thus he would be justified in stepping upon the mill lead track. This assumes, however, what must forever rest in conjecture,—that Moore did look towards the end of the train, saw it, and saw no one upon it. And again, a brakeman took this position, not as a signal that the train was about to move, but, according to the evidence, to warn people upon the track. Still further, Moore, had he looked, could not assume, because he saw no one at that moment, that the brakeman would not be in place, and the train started immediately afterwards.

As no negligent act was shown which either contributed to or caused Moore's death, the special finding, to the effect that he came to his death through the negligent acts of the foreman and the rear brakeman of the switching crew, was unwarranted, and the general verdict in plaintiff's favor was unsupported by the evidence. The defendant must not only have been negligent, but this negligence must have contributed to or caused the death. This view of the case renders any consideration of the claim that Moore was guilty of contributory negligence unnecessary.

The judgment must be reversed, and, as counsel are agreed that a new trial will be of no avail, judgment will be entered for defendant in the court below upon remittitur.

Judgment reversed.