FRED MCREA *vs.* HILLSBORO NATIONAL BANK.

Opinion filed April 19th, 1897.

**Directing Verdict—Conflicting Evidence.**

> Where there is a substantial conflict in the evidence, it is error to withdraw an issue of fact from the consideration of the jury. Evidence examined, and *held*, that the instructions of the trial court, directing a verdict in plaintiff's favor, constituted an invasion of the province of the jury, and hence were error.

Appeal from District Court, Traill County; *McConnell*, J.

Action by Fred McRea against the Hillsboro National Bank. Verdict directed for plaintiff. From an order refusing to vacate the verdict and grant a new trial, defendant appeals.

Reversed.

*Carmody & Leslie*, for appellant.

*J. H. Bosard*, for respondent.

WALLIN, J. The complaint in this action charges, in effect, that on December 1, 1890, the plaintiff was the owner and in possession of a span of black mares, a set of double harness, and a buggy, and that on said day the plaintiff "delivered" said property to one Wright, under a contract whereby Wright agreed to pay as purchase price therefor the sum of $325, within the two weeks after such delivery, said purchase price to be paid in wood; that the title of said property, under said agreement, was to be and remain in the plaintiff until said purchase price was paid, that on January 5, 1891, said Wright paid in wood on said price the sum of $29; and that the defendant on or about the 16th of January, 1891, wrongfully took possession of said property, and converted the same to his own use, to plaintiff's damage, etc. The answer admits the delivery to Wright, and his agreement to pay the price alleged as purchase money, but alleges, in substance, that the transaction between Wright and the plaintiff was an unconditional sale, whereby the title passed at the time of the delivery of the property to Wright, and further alleges that the

N. D. R.—23

defendant came into possession of the property lawfully about January 16, 1891. The case was tried to a jury, and at the conclusion of the testimony the trial court instructed the jury that under the evidence the plaintiff was entitled to a verdict for the value of the property at the time it came into the defendant's possession, and that the jury should, after arriving at the value of the property from the evidence, return a verdict for the plaintiff. This instruction, in so far as the court directed the jury to find a verdict for the plaintiff, was excepted to by the defendant, and the question presented by such exception is the principal question to be determined in this court. Where, at the conclusion of a trial, an issue of fact is withdrawn from the jury, and a verdict is directed upon such issue, the test of the correctness of the ruling has been variously stated in the authorities. Citations upon this familiar feature of the practice would seem to be unnecessary. It is entirely safe to say that, where there is a substantial conflict in the evidence drawn out at the trial, it is error to direct a verdict upon an issue of pure fact. Where honest and intelligent minds might reasonably differ as to the proper conclusions to be drawn from the evidence, it is error to withdraw the case from the jury. A motion made at the close of the trial to direct a verdict is in the nature of demurrer to evidence, and upon such demurrer it is well settled that all fair inferences from the evidence which are favorable to the party opposing such demurrer must be drawn by the court. Applying this test to the evidence in this case, we are of the opinion that the court below erred in withdrawing the principal question of fact in the case from the consideration of the jury, viz. whether the sale transaction set out in the pleadings was or was not an absolute sale, whereby the title passed from plaintiff to said Wright. If title did pass, then the verdict was wrong, both legally and morally.

Looking into the evidence, we find serious discrepancies therein, and to our minds it is, when fairly construed, so conflicting and dubious in its character that it should have been presented to the jury for determination. In describing the sale

transaction, the plaintiff testified: "On the way, we got to talking about business, and I told him I wanted to sell my team. He asked me what I would take for the team, and I told him $325 for the team, rig, blankets, and all. We kept talking, but came to no conclusion until we came to Reynolds. He said 'Drive to the hotel;' and we drove to the hotel to get warm. I drove up, and he said, 'Take them over to the barn and put them up;' and I drove over to the barn and put the team in. We were cold, and went into dinner. After dinner he broached the subject of the team, and I told him I would take wood delivered in Grand Forks. He said he would deliver maple at $5, and oak at $4.50, laid down at Grand Forks. I told him I would take wood delivered at that price. I asked him how the county laid there [meaning at Reynolds;] and I found out that Main street was the county line, and the horses, which at the present time were in the barn, and were on one side of the county line, and we were on the other, and, by taking a mortgage on the team, I would have to record it in both counties. I did not feel like doing that, so I told him I would leave the team in the barn, and, when he delivered to me the wood to that value, he could take the team; but they were to remain in my possession—be mine—until I got the value. I told him he was a stranger to me, and could not expect me to let him take the team. He said he would ship me the wood by the last of the week. I said, 'I have the team in the barn, and, when I get my wood to the full value, then the team shall be yours, and not before that.' I took the train that evening for Grand Forks. He was to take the team out when he paid me in full, and pay the expenses of the team from that day in the barn. Q. Did he ship you any wood? A. After I went to stirring him up for quite a while, there came a carload of wood to Grand Forks, but there was no freight paid on it. I had sold a good deal of other wood for him. I realized out of the wood about $28 or $29, and that is all I have ever received." On cross-examination, plaintiff testified: "I contracted to sell wood for him. He wanted me to go on the road and sell, and at that time

I was out of business.   This was the only day he ever shipped to me.   I do not remember how long Mr. Wright had the team in his possession before he shipped me a car of wood, but it must have been about five weeks.   I had seen him several times, up until about the 1st day of January.   I do not remember just the day.   Have no record, and cannot tell just what day he shipped me the carload of wood.   In the meantime I had conversation with him as to why he did not ship the wood.   He claimed all the while that the wood was on the track.   I made no attempt to get the team back while it was in Wright's possession, only once.   I told him just before he went away that I must have my pay, or would have the team; I wanted one of the two at once. In trying to sell the wood for Wright, I contracted one carload at the Ingalls House, and one at Larimore, five cars to W. H. Robinson, and one car load at the Occidental Hotel, Casselton. I was down there two days, and the balance of the time I was at Grand Forks.   I was living there, and working in the store.   The wood which I contracted to sell was to be shipped from Wright straight to the parties, and I was to have a commission.   I think he could not have shipped wood to other parties without my knowing it.   I notified him that I had sold wood to these parties. I do not think he could have shipped the wood to them.   They hounded me for it.   He did not ship a stick of wood to them. He left the country.   That was the forepart of January or February,—the forepart of January, I think."   The evidence discloses that, for some five weeks after the sale transaction, Wright had the property in his possession, and used it frequently about his business as a keeper of a feed store at Hillsboro, and that while so using the property he placed certain chattel mortgages upon it, and also sold it, taking a chattel mortgage for the purchase price, and finally that Wright absconded from the state, leaving the property within the state.   After Wright disappeared, the plaintiff, learning about one of the chattel mortgages, went to a man named Clure, who had a mortgage upon the property, and gave Clure $100, and thereby obtained possession of it; but the

defendant took it ,upon other chattel liens placed upon it by Wright to secure a loan from the defendant. A. L. Plummer, a witness for defendant, testified to a conversation had with McRea after the sale, as follows: "He said that he sold him the team, and he was to pay him in wood; that he took him to be an honest man, and that he would get his pay; but, he said, 'I have lost it.' I asked him why he didn't take a mortgage, and he said he didn't know anything about the laws of this country. I said: 'If you had taken a mortgage, you would be safe. You would have a first mortgage.' He said he didn't know anything about it; that he supposed the man was honest and would pay."

Analyzing this testimony, we notice first that it flatly contradicts the plaintiff's complaint in the action, in this: The complaint charges squarely that the plaintiff, as a result of his transaction, "delivered" the property to J. H. Wright. In testifying the plaintiff states and reiterates that he made no delivery of the property, but, on the contrary, says, "I told him I would leave the team in the barn, and, when he delivered to me the wood to that value, he could take the team; but they were to remain in my possession—be mine—until I got the value." This testimony is not only directly opposed to the statement of fact set out in the complaint, but is entirely inconsistent, also, with the statement he makes, as a witness, of his reasons for not taking a chattel mortgage to secure the purchase money. If the team was to remain in his own possession, and to continue to be his property, until the wood was all delivered, then there would be no occasion to take any mortgage to secure the purchase money, nor would Wright hold any interest in the property which he could lawfully mortgage. Both tittle and possession would in such case have been in the plaintiff, and therefore no mortgage would be needed. Again, the evidence shows that Wright made default, and for some weeks failed to deliver the wood as he had contracted to do. To our minds, there is strong ground in the testimony for believing that plaintiff was well aware that the property was in Wright's possession, and that he

acquiesced therein. Plaintiff testifies: "I made no attempt to get the team back while in Wright's possession, only once. I told him just before he went away that I must have my pay, or would have team. I wanted one of the two at once." We think the jury should have been allowed to say whether this last feature of the evidence did not tend to show that plaintiff did in fact deliver the property to Wright, as he alleged that he did in his complaint; and this view is strongly corroborated, we think, in the version of the transaction which A. L. Plummer swears to as that given him by plaintiff in a conversation had at Grand Forks. According to that testimony, the reason why plaintiff did not take a chattel mortgage was not because he retained title and possession until the property was paid for, but because he thought Wright was an "honest man, and he would get his pay." The questions involved were questions of pure fact, and were of a kind which frequently arise in business dealings, and were, therefore peculiarly within the province of a jury to determine from evidence aided by the light of their own experience as practical business men. We think, in view of the discrepancies in the testimony, that the ruling of the court below which we are reviewing was an invasion of the province of the jury, and therefore error. We have heretofore had occasion to animadvert upon the too frequent practice of withdrawing issues of fact from a jury where there is a substantial conflict in the evidence. *Slattery v. Donelly*, 1 N. D. 264, 47 N. W. Rep. 375; *Hazelton Boiler Co.* v. *Fargo Gas, etc. Co.*, 4. N. D. 365, 61 N. W. Rep. 151; *Vickery* v. *Burton*, (N. D.) 69 N. W. Rep. 193.

The order denying a new trial is reversed, and a new trial will be granted. All the judges concurring.