JACOB SCHERER, AS ADMINISTRATOR OF THE ESTATE OF FRANCES SCHERER, DECEASED v. FRANK SCHLABERG AND FRANK L. GRIFFIN, CO-PARTNERS AS SCHLABERG & GRIFFIN.

Opinion filed September 30, 1909.

### Death by Wrongful Act — Death of Child — Measure of Damages.

1. In an action by a father for the death of a minor child by wrongful act of defendant, the measure of damages recoverable by the father is the probable value of the services of the child during minority to the father, considering the cost of support and maintenance during the early and helpless part of its life.

### Same — Conjectural Damages — Nominal Damages.

2. In an action by a father for damages for the wrongful death of a daughter three months old, who is dangerously ill with uremia when the wrongful act complained of was committed, the question of the pecuniary injury of the father by the death of such child, if caused by the wrongful act of defendants, is purely a matter of speculation, conjecture and guesswork, and any verdict for more than nominal damages in favor of the father would necessarily be based upon conjecture or speculation.

### Same — Cause of Death — Sufficiency of Evidence.

3. The child, damages for whose death by wrongful act of defendants are sought in this action by the father, was a girl three months old, dangerously ill with uremia. A physician was called, and left with the parents a prescription on defendant's drug store for medicine. By mistake of the defendant druggists medicine was given plaintiff containing one-eighth of a grain of morphine in each dose directed to be given. The infant afterward died. *Held*, under the evidence, that the jury, had the case been submitted to it for a verdict, could only have found a verdict for plaintiff based upon pure speculation and surmise as to the cause of the child's death.

### Trial — Directed Verdict.

4. When the nature of the evidence, in an action for damages, is such that no verdict for the plaintiff can be returned except based upon mere conjecture, surmise or speculation, it is proper for the trial court to direct a verdict for the defendant.

### Death by Wrongful Act — Contributory Negligence of Plaintiff Beneficiary.

5. In an action under the statute providing for the recovery of damages for death by wrongful act of defendant, the contributory negligence of the plaintiff beneficiary is a defense.

**Same.**

6. The prescription of an attending physician called for medicine in the form of a powder, to be given, one every three hours, to an infant three months old. The prescription was left with the mother of the child, and she was informed by the physician that it would be in powder form, and to give a dose once in three hours. By mistake of the defendant druggist, medicine, put up for another customer, in liquid form, the label on the bottle being marked with the name of the party for whom it was prescribed, and containing directions to give one teaspoonful every two hours until relieved, was delivered. The plaintiff father was not present when the information and the directions were given the mother by the doctor, but before any of the medicine was given was informed by the mother what the directions were. He also read the directions on the bottle, and knew that the prescription given had been for a powder. He was present when the liquid was administered to the child, and permitted it to be done. After the first dose was given, and when nearly time for the second dose to be administered, he suspected something wrong in the medicine, and telephoned the doctor from the residence of a neighbor. He left his home to telephone without imparting his suspicions to his wife, or directing her to delay the second dose until he had heard from the doctor, and the second dose was given before his return. *Held,* that under these facts, and others disclosed by the record, the plaintiff was guilty of contributory negligence in law.

Appeal from District Court, Grand Forks county; *Templeton, J.*

Action by Jacob Scherer, as administrator of the estate of Frances Scherer, against Frank Schlaberg and Frank L. Griffin. Judgment for defendants and plaintiff appeals.

Affirmed.

*Skulason & Burtness,* for appellant.

Contributory negligence of a parent, although a beneficiary, not a defense. Norfolk Railroad Co. v. Groseclose, 88 Va. 267, 29 Am. St. Rep. 718; Wymore v. Mahaska County, 43 N. W. 264.

Negligence of one member of a family not attributable to another.

Cleveland, Columbus and Cincinnati Ry. Co. v. Crawford, 24 Ohio St. 631, 15 Am. Rep. 633; Davis v. Guarnieri, 45 Ohio St. 470, 15 N. E. 350, 4 Am. St. Rep. 548; Wolf Admr. v. Lake Erie & W. R. Co., 55 Ohio St. 517, 45 N. E. 708, 36 L. R. A. 812; Donk Coal Co. v. Leavitt, 109 Ill. App 385; Atlanta & Charlotte Air Line Ry. Co. v. Gravitt, 93 Ga. 369, 20 S. E. 550, 26 L. R. A. 553; Louis-

ville N. A. & C. Ry. Co. v. Creek, 29 N. E. 431; Town of Knightstown v. Musgrove, 18 N. E. 452.

If from the facts different conclusions may be drawn by fair and impartial men, the case is one for the jury. Mares v. N. P. R. Co., 3 Dak. 336, 21 N. W. 5; Id., 123 U. S. 710, 8 Sup. Ct. 321, 31 L. Ed. 296; Heckman v. Evenson, 7 N. D. 173, 73 N. W. 427; Cameron v. Ry. Co., 8 N. D. 124, 77 N. W. 1016; Owen v. Cook et al., 9 N. D. 134, 81 N. W. 285, 47 L. R. A. 646; McKeever v. Homestake Mining Co., 10 S. D. 599, 74 N. W. 1053; Bohl v. City of Dell Rapids, 15 S. D. 619. 91 N. W. 315; Pyke v. City of Jamestown (N. D.) 107 N. W. 359; Sarja v. G. N. Ry. Co., 109 N. W. 600; McTavish v. G. N. Ry. Co., 8 N. D. 333; Herbert v. N. P. Ry. Co., 3 Dak. 38; Williams v. N. P. Ry. Co., 3 Dak. 168.

*Bangs, Cooley & Hamilton,* for respondent.

Contributory negligence of the beneficiary is a complete defense. Vinette v. Nor. Pac. Ry. Co. 91 Pac. 975; Westbrook v. Mobile & Ohio R. Co. 66 Miss. 560; 14 Am. St. 587; Lindsay v. Railway Co. 35 Atl. 513; Ploof v. Burlington Traction Co. 41 Atl. 1017; Wolf v. Lake Erie & W. R. R. Co. 36 L. R. A. 812; Woodward v. Chicago & N. W. R. Co. 23 Wis. 400; Chicago City Ry. Co. v. Wilcox, 27 N. E. 899. Ill. Cent. Ry. Co. v. Warriner, 82 N E. 246; City of Pekin v. McMahon, 154 Ill. 141; 45 Am. St. 114; Apsey v. Detroit, L. & N. R. Co. 47 N. W. 319. Indianapolis St. Ry. Co. v. Antrobus, 71 N. E. 971; Spokane & Pacific Ry. Co. v. Holt, 40 Pac. 56; Tucker v. Draper, 86 N. W. 917; Mills' Adm'r v. Cavanaugh, 94 S. W. 651.

Where the evidence connecting the infant's death with the negligence of defendant is purely speculative, there is no question for the jury. Koslowski v. Thayer et al, 68 N. W. 973; Moore v. Gt. Nor. Ry. Co. 69 N. W. 1103; Peterson v. C. M. & St. P. Ry. Co. 102 N. W. 595; Traux v. M. St. P. & S. M. Ry. Co., 94 N. W. 440; Wadsworth v. Boston El. Ry. Co., 66 N. E. 421; Baltimore & O. R. Co. v. State, 61 Atl. 189. 192. Standard Oil Co. v. Murray, 116 Fed. 572, 576; Balding v. Andrews, 12 N. D. 267, 96 N. W. 305; Meehan v. Gt. Nor. R. Co., 13 N. D. 432, 101 N. W. 183; Atchison T. & S. F. R. Co. v. Aderhold, 49 Pac. 83; Sherman v. Lumber Co., 45 N. W. 1079, Searles v. Manhattan Ry. Co. 5 N. E. 66; Laidlaw v. Sage, 52 N. E. 679. 689; Bond v. Smith et al., 21 N. E. 128; Cole v. German S. & L. Soc. 124 Fed. 113; Stratton

v. Nichols L. Co. 81 Pac. 831. Wheelon v. C. M. & St. P. R. Co., 52 N. W. 119.

There being no proof of father's age or other condition; nor of the three months child's mental or physical condition or characteristics, there was nothing for the jury to use as a measure of its aid to the father had it lived   Regan v. C. M. & St. P. Ry. Co., 8 N. W. 522; Cooper v. Railway Co., 33 N. W. 306; Atrops v. Costello 35 Pac. 620; Houghkirk v. President et. 92 N. Y. 223; Gunderson v. N. W. El. Co., 49 N. W. 694; Atchison T. & S. F. Ry Co. v. Fajardo, 86 Pac. 300; Walker v. L. S. & M. S. Ry. Co., 62 N. W. 1032; Potter Adm'r v. C. & N. W. Ry. Co., 21 Wis. 377.

. SPALDING, J.   The plaintiff, Jacob Scherer, and his wife, Anna Scherer, were on March 20, 1906, the parents of a female child named Frances one day less than three months old.   As far as shown by the evidence the child was healthful up to the time of the illness hereinafter described.   On Sunday, March 18, 1906, this daughter became unwell.   Tuesday morning, the 20th, Dr. Taylor was called and gave directions for the treatment of the child.   He called again in the afternoon, and gave Mrs. Scherer a prescription on the drug store of the defendants.   The doctor told the mother to send the prescription to the drug store, and that the medicine it called for would be in the form of powders, and to give one powder to the child every three hours.   The husband was not present when these directions were given.   The prescription was sent to the drug store about 5 o'clock by Stella Brady, who gave it to one of the druggists in the store, and received in return a claim check.   She left the drug store, and on her return in a short time the same person to whom she gave the prescription delivered to her the medicine.   She carried it to the plaintiff's residence, and was directed by the mother to place it on a writing desk, which she did.   It was allowed to remain there until the return of the father about 6:30 p. m., when he and the mother examined it, and commented on its being in a bottle and a liquid, instead of in powders, as the doctor had stated it would be.   The mother told the plaintiff that the doctor said it would be in powders, and his directions.   She could not read English.   The plaintiff could.   He read the label on the bottle and the directions.   The name of some person was written on the label.   He testifies that he could read the name "Rose," but that the other name was blurred and could not be read; that

he thought that was the name of the medicine. In fact the name "Rose Clark" was distinctly written on the label before the directions. The directions which he read were to give one teaspoonful every two hours until relieved. The liquid in the bottle contained two grains of morphine, or about one-eighth of a grain to a teaspoonful. After discussing the difference between the medicine received and the statement of the doctor, plaintiff and wife, notwithstanding the lack of opportunity for the doctor to change the prescription, concluded that the doctor had changed his mind and put up a liquid. The father did not administer the medicine, but was present when the mother, with the assistance of another lady, did administer it. On attempting to give it undiluted, the child appeared to dislike it and suffer from the contact of the medicine with her mouth; and, although the directions said nothing about diluting, the mother reduced it with water and administered about a teaspoonful. Fifteen or 20 minutes after it was given the child appeared to suffer, and without entering into details of the testimony of the different witnesses, it suffices to say that the child was evidently in distress. The father waited until a few minutes before time for the second dose, when, suspecting that the changed condition of the child for the worse was caused by a mistake in the medicine, he went to a neighbor's about two blocks away and telephoned the doctor. He left without indicating to the mother his suspicion regarding the medicine, or cautioning her about giving another dose before he had communicated with the doctor. The doctor informed him that it was the wrong medicine. He returned in haste to his home and found that the second dose had just been given. The doctor arrived shortly, examined the child, and found a slight dilation of the pupils of the eyes. He testifies to no other symptom of morphine poisoning. The testimony of the different physicians indicates that if the digestive organs were in normal condition, the morphine would have been absorbed into the system in a few minutes, but that when the digestive system is out of order morphine may remain a considerable time in the stomach. The doctor washed out the stomach with permanganate of potash, for the purpose of relieving it from any morphine which it retained. He testifies that the effect of a solution of permanganate of potash used in this manner is to decompose and render morphine inert and absolutely harmless. He also gave the child a hypodermic of atropine to counteract the effect of any morphine which might have been

absorbed. This was done about 9 o'clock in the evening. He remained with the child until about 1 o'clock in the morning, and testifies that he made use of tests to determine whether there were any remaining effects of the morphine present, and that it is his positive judgment that when he left the child was free from any ill effect which she might have had from the morphine. She was lying perfectly still when he left, but the parents testified that she subsequently had several convulsions. The doctor called again the next forenoon, and found it still a very sick child, and it died about noon Wednesday. This action was brought under the provisions of the statute giving the father the right to maintain an action for death of his child by wrongful act, and it is for his benefit, he being the sole heir at law.

At the close of the case the defendants moved for the direction of a verdict in their favor on the following grounds: (1) That the evidence fails to show that the infant Frances Scherer died from the effects of administering the liquid called for by the prescription Exhibit C; (2) that the evidence fails to show that the defendants, or their agents, were guilty of any act which, or the result of which, was the proximate cause of the death of the infant, Frances Scherer; (3) that there is no evidence in the case upon which the jury can base a deliberate judgment that the death of the infant, Frances Scherer, was caused by the administering of the liquid called for by Exhibit C; that such verdict, if rendered, would be necessarily based on mere surmise, conjecture, and speculation; (4) that the evidence fails to show any facts from which, or upon which, the jury can base any damages; (5) that there is no evidence in this case which can be used by the jury as a measure of pecuniary aid which the father might reasonably expect from the infant Frances Scherer, had she lived; that damages, if awarded, could not be the result of judicial determination upon the evidence, but would be the result of the uncontrolled discretion of the jury; (6) that the evidence discloses that Anna Scherer, the mother of the infant, Frances Scherer, was, in exercising the care and custody of said Frances Scherer, acting as the authorized agent of said father, Jacob Scherer; that the negligence of either the father, Jacob Scherer, or the mother, Anna Scherer, in exercising such care and custody contributing to the death of such infant, would bar a recovery, and that the evidence discloses affirmatively such negligence on the part of both Jacob

Scherer and Anna Scherer contributing to the death of said infant, if such death was caused by the administering of the liquid claimed, as in law constitutes contributory negligence and bars a recovery; (7) that the evidence fails to show facts sufficient to constitute a cause of action against the defendants. The motion was granted, and the plaintiff duly excepted. From the judgment entered dismissing the action, and for costs against the plaintiff, this appeal is prosecuted. We have not stated the substance of all the evidence, and we cannot do so and confine this opinion within proper limits. It will simplify the intelligent consideration of the case to consider some of the reasons given by the respondent for sustaining the judgment, rather than to pursue the usual course of discussing the errors assigned by appellant, as appellant's assignments of error are in general terms.

1. It is contended that there is no evidence which could have been considered by the jury to furnish a measure of pecuniary injury which the father suffered from the death of the child. The rule regarding the measure of damages recoverable by the father for the death by wrongful act of a minor child seems to be the probable value of the services of the child during minority, considering the cost of support and maintenance during the early and helpless part of its life. Haug v. Railway Company, 8 N. D. 23, 77 N. W. 97, 42 L. R. A. 664, 73 Am. St. Rep. 727; Morgan v. S. P. Company, 95 Cal. 510, 30 Pac. 603, 17 L. R. A. 71, 29 Am. St. Rep. 143; Little R. & F. S. Ry. Co. v. Barker, 33 Ark. 350, 34 Am. Rep. 44; Smith v. C. M. & St. P. Ry. Co., 6 S. D. 583, 62 N. W. 967, 28 L. R. A. 573; Sutherland on Damages, § 1273. No evidence is presented in the record showing the age of the father or the expectancy of his life. This has been held to be fatal to recovery by the plaintiff; but, as we view the law, it is an immaterial omission in this instance. It was a female child only three months old. Dr. Taylor testified that it was dangerously ill when he called to see it, suffering from uremic poisoning. It is obvious that, with a female child three months old, dangerously ill, the pecuniary value of its life during its minority is wholly problematical and speculative. It is conceded that in actions of this nature juries are not confined to the consideration of the evidence alone, as they are in many other kinds of actions, but they may exercise a much wider latitude in applying their own knowledge and experience than would be proper in most other cases, but it is

apparent that no evidence, no knowledge, or experience of the jurors could justify them in saying that this child would have lived had, no mistake been made in the prescription, or that in case of its continued life its earning capacity would have exceeded the expend-. itures necessary in its maintenance and education.  On the contrary, the experience of mankind in civilized communities warrants the conclusion that its net earning capacity would most likely be a negative quantity.  When it is impossible to arrive at a verdict except by speculation or surmise, guesswork, or conjecture, the case should be taken from the jury.  Koslowski v. Thayer, 66 Minn. 150, 68 N. W. 973; Moore v. Gt. N. Ry. Co., 67 Minn. 394, 69 N. W. 1103; Peterson v. C., M. & St. P. Ry. Co., 19 S. D. 122, 102 N. W. 595; Truax v. M., St. P. & S. M. Ry. Co., 89 Minn. 143, 94 N. W. 440; Harrison v. C., M. & St. P. Ry. Co., 6 S. D. 100, 60 N. W. 405; Sherman v. Lumber Co., 77 Wis. 22, 45 N. W. 1079; Wheelan v. C., M. & St. P Ry. Co., 85 Iowa, 167, 52 N. W. 119; Balding v. Andrews, 12 N. D. 267, 96 N. W. 305; Meehan v. G. N. Ry. Co., 13 N. D. 432, 101 N. W. 183; Wadsworth v. Boston El. Ry. Co., 182 Mass. 572, 66 N. E. 421; Baltimore & O. R. Co. v. State, 101 Md. 359, 61 Atl. 189, 192; Standard Oil Co. v. Murray, 119 Fed. 572, 576, 57 C. C. A. 1; Atchison, T. & S. F. R. Co. v. Aderhold, 58 Kan 293, 49 Pac. 83; Ruppert v. Brooklyn Heights R. Co., 154 N. Y. 90, 47 N. E. 971; Laidlaw v. Sage, 158 N. Y. 73, 52 N. E. 679, 689, 44 L. R. A. 216; Byrd v. So. Ex. Co., 139 N. C. 273, 51 S. E. 851; Stumpf v. Delaware, L. &. W. R. Co. (N. J. Sup.) 69 Atl. 207. Most of the American courts sustain the doctrine of nominal damages, although this doctrine is denied by the English authorities. We shall not determine which line of authorities is applicable in this state nor whether nominal damages would be proper in a case of this character, or similar cases.

2.   It is next contended that the judgment should be sustained because any verdict rendered for plaintiff on the evidence as to the cause of the death of the child must have been purely speculative and conjectural.  Dr. Taylor testifies that the child was dangerously ill with uremic poisoning.  It is shown that it passed no urine for 24 hours, that its bowels did not act, and, without detailing the symptoms testified to both by the parents and others, as well as the doctor, that, with the exception of the slight contraction of the pupil, they indicated uremic poisoning, and not poison from morphine.  The testimony of the physicians is in the main uniform on

this question, and as to the cause of the death, although Dr. Engstad, a witness for the plaintiff, testified when first on the stand that he did not think the child would die from one dose of the morphine solution; that it would depend upon the measures taken to counteract the poison, and it would be very hard to say whether it would die from the administration of two doses, and that it was a question very difficult to answer; that he could not give a direct answer. And in answer to a hypothetical question, which did not state all the material facts and circumstances as testified to by Dr. Taylor showing the condition of the child, he stated that the giving of morphine to the child, "had at least a predisposing cause, if not a direct cause." He explained what he meant by "predisposing cause" by an illustration that, when a person accustomed to partake heavily of whiskey contracted pneumonia, he would, in all probability, die; that the direct cause of his death would be pneumonia, but that the predisposing cause would be whiskey. He also testified that there were cases where he knew morphine had been retained in the stomach for two or three hours, or more, without being absorbed to any great extent, and that he had had cases, when morphine used to be given by the mouth, in which he did not get action from the morphine for an hour or two. Drs. Grassick, Healy, and Wheeler corroborated Dr. Taylor in his statement that the child died of uremic poisoning. We are of the opinion, after considering all the evidence submitted, that the trial court was justified in taking the case from the jury. The answer of Dr. Engstad, based upon the hypothetical question which failed to state the most marked symptoms of the child as testified to by Dr. Taylor, at most constituted but a scintilla of evidence in conflict with that given by the other physicians, and any verdict rendered for the plaintiff would have been based upon pure conjecture and guesswork. No jury could say what caused the child's death. As to this the authorities previously cited are applicable.

3. It is urged in support of the judgment of the trial court that the father was guilty of contributory negligence, and that for this reason he was not entitled to recover. It is perfectly clear that, notwithstanding the inexcusable mistake or negligence of the defendant, no injury would have resulted except for the carelessness, or lack of care, of the parents in administering medicine which they knew differed in character, in dose, and in the frequency of the dose from that prescribed by the physician in attendance. The doctor

plainly told the mother that the prescription would be in the form of a powder, to be given once in three hours. The child was dangerously sick. She did not send to the drug store for some time after the doctor left. A liquid was returned, the bottle inscribed with the name of the party for whom it was put up. The directions materially differed from those given by Dr. Taylor. All this was known by the father who, while not assisting in administering it, was present when the first dose was given, and did nothing to prevent its administration. After the change in the condition of the child, he suspected something wrong with the medicine, and, within a few minutes of the time for the second dose, left his home without suggesting that another dose should not be given until he consulted with the doctor. He was absent a considerable length of time, and on return found that the second dose had been given. It is argued, however, that they discussed the change in the medicine, and concluded that the doctor had changed his mind and put up a different remedy. It is apparent that this conclusion is a mere afterthought, and could have had no foundation, because the doctor was not seen in the meantime. The prescription was left with the mother. The preson who took it to the drug store delivered it to the druggist, not to the doctor. How it was possible for the doctor to have made the change is not suggested. A telephone was within such distance that they could have informed themselves as to the cause of the change of medicine without delay or difficulty. They neglected to do so. The fact that it was an infant three months old, very sick, and, as they must have known, by reason of its age and other conditions, susceptible to very small quantities of any medicine, charged them with a high degree of care. Had it been a grown person who was ill, their duties would have been different. A dose for one grown person would ordinarily approximate a dose for another grown person, but not so as to a grown person and an infant three months old, as they must have known. Whatever the results may have been from the administration of the morphine solution, it is clear to us that, notwithstanding the gross negligence of the defendants, no ill results could have occurred except for the negligence of the father in permitting the administration, not only of the first, but also of the second dose, and that his negligence was the proximate cause of any injury to the child resulting from the action of the defendants, if any injury did result, and that therefore he cannot recover.

4. It is urged by appellant in this connection that negligence of the father or mother is imputed negligence, and that to sustain the judgment on the ground of contributory negligence this court must adopt the doctrine of imputed negligence; that is, that if the father was negligent, his negligence must be imputed to the child, on the theory that contributory negligence of the child must be shown to support the defense of contributory negligence against the father, and that if the contributory negligence of the father would be a defense, the contributory negligence in this case was that of the mother, and can be imputed neither to the father nor to the deceased. As we view the law and the facts, the question of imputed negligence is not in this case in any degree whatever. The father knew all the facts, and was present when the medicine was given, and acquiesced in its being administered, and the negligence was his. He is the beneficiary, and the contributory negligence of the beneficiary defeats the action. The remedy applicable in this case, and in cases of this nature, is not for the benefit of the estate of the deceased, nor is it sought in behalf of the deceased. It is a remedy given for the heir at law who suffers injury by the wrongful death, and is for the sole benefit of such heir at law. Proceeds of any recovery go to him, in this case the father, and not to the estate of the deceased. And to say that he shall be allowed to recover, when he himself is guilty of contributory negligence, is to permit him to reap the benefit of his own wrong doing. Atlantic Ry. Co. v. Gravitt, 93 Ga. 369, 20 S. E. 550, 26 L. R. A. 553, 44 Am. St. Rep. 145; Tucker v. Draper, 62 Neb. 66, 86 N. W. 917, 54 L. R. A. 321; Westerberg v. K. C., etc., Ry. Co., 142 Pa. 471, 21 Atl. 878, 24 Am. St. Rep. 510; Westbrook, Mobile & O. R. Co., 66 Miss. 560, 6 South. 321, 14 Am. St. Rep. 587; Ploof v. Burlington Traction Co., 70 Vt. 509, 41 Atl. 1017, 43 L. R. A. 108; Bamberger v. Citizens' St. Ry. Co., 95 Tenn. 18, 31 S. W. 163, 28 L. R. A. 486, 49 Am. St. Rep. 909; Smith v. Hestonville, M. & T. Co., 92 Pa. 450, 37 Am. Rep. 707; Johnson v. Reading & C. Ry. Co., 160 Pa. 647, 28 Atl. 1001, 40 Am. St. Rep. 752; City of Pekin v. McMahon, 154 Ill. 141, 39 N. E. 484, 27 L. R. A. 206, 45 Am. St. Rep. 114; W. U. Tel. Co. v. Hoffman, 80 Tex. 420 15 S. W. 1048, 26 Am. St. Rep. 759. In the Gravitt and Ploof Cases, supra, will be found very full citations of authorities and discussions of the law applicable to the case at bar.

The circumstances surrounding this case at the same time excite the profound sympathy of the court for the father and mother, and

a feeling that such gross carelessness as that of defendants, though harmless in its results, ought to be followed by appropriate punishment, but the decision of courts would justly cease to deserve the respect which is accorded them if they permitted their sympathies or their indignation to serve as a guiding motive in the determination of questions of law.

As we find no error in the action of the trial court, its order is affirmed.

FISK, J., disqualified, and C. A. POLLOCK, Judge of the Third Judicial District sat in his stead. CARMODY J., and POLLOCK, District Judge, concurring. MORGAN, C. J. concurs in the result without considering the questions of damages.

ELLSWORTH, J. (dissenting). I am unable to concur in the result announced by my associates in this case, or in their reasoning upon any of the points passed upon by the majority opinion.

The principles accepted by this court as governing the disposal upon appeal of cases tried to a jury in which a verdict has been directed by the court are so strongly established and well recognized that they cannot now be the subject of dispute or difference of opinion. When a trial court, at the close of the entire testimony in an action tried before it, holds as a matter of law that one party or the other is entitled to a verdict, and directs the jury sitting in the case to find accordingly, and an appeal is taken from the judgment entered upon the directed verdict, observance of these principles requires this court to disregard all conflicts in the evidence, and in its consideration of the case to construe the evidence most strongly against the party moving for the directed verdict. If it appears from the evidence so considered that the facts shown are such that different impartial minds might fairly draw different conclusions therefrom, it follows that the issues of fact should have been submitted to the jury—the body of men provided by the Constitution and laws for the determination of disputed or doubtful questions of fact. "The rule is the same where the evidence is undisputed, if different inferences therefrom may be fairly deduced by intelligent minds." It is only when it can be said that all reasonable and fair-minded men must, with the same facts before them draw but one conclusion from the evidence, that a trial court is warranted in any manner, or to any extent whatever, in controlling or directing the verdict of the jury. If, therefore, in the consideration of an appeal from a judg-

ment entered on a directed verdict, it appears that "the evidence is such that intelligent men may fairly differ in their conclusions thereon upon any of the essential facts of the case, it is the duty of this court to reverse the judgment and order a new trial." Cameron v. Gt Nor. Ry. Co., 8 N. D. 124, 77 N. W. 1016; Vickery v. Burton, 6 N. D. 245, 69 N. W. 193; McRea v. Bank, 6 N. D. 353, 70 N. W. 813; Pirie v. Gillit, 2 N. D. 255, 50 N. W. 710; Zink v. Lahart, 16 N. D. 56, 110 N. W. 931; Hall v. N. P. Ry. Co., 16 N. D. 60, 111 N. W. 609; Carr v. Soo Ry. Co., 16 N. D. 217, 112 N W. 972.

The facts admitted by the defendants in this case disclose a gross and entirely inexcusable act of negligence on their part. They were druggists, engaged in the business of compounding the medicines prescribed by physicians, and furnishing the same to patients the safety of whose health and lives are dependent upon the skill and care of those who undertake the performance of this highly important, delicate, and often dangerous duty. While so acting, they received a physician's prescription which upon its face indicated that the medicine prescribed was to be compounded for the use of an infant or "baby," and, after taking time sufficient to enable them to prepare the same with the greatest deliberation and care, delivered to the person sent to receive the medicine an entirely different compound, containing strong and poisonous ingredients that might be safely used only by a grown person. So little attention seems to have been given to the prescription for the infant's use that it was not known by the defendants that a mistake had been made, and that a medicine so dangerous to the life of the infant had been sent to it until two or three hours afterward, when the medicine in considerable quantity had been administered to the child and the bottle containing it returned to them by its father. While it is true that a court, in the consideration of facts such as these, should not permit emotional sentiments such as the sympathy or indignation to disturb its judgment, or cause it to disregard well-established principles of procedure, it is nevertheless its duty to search the facts with the greatest care to determine whether the harmful effect that naturally proceeds from negligence so culpable as this has not in fact resulted, and, if the evidence shows such to be the case, to hold the negligent party to strict liability to the extent of the damage suffered.

The negligent act of the defendants is admitted, the death of the child following shortly thereafter is proved, and if there is evidence showing, or tending to show, that the death of the child resulted

as a proximate cause of the negligent act, a case is made out entitling the plaintiff and appellant in this case to damages under the statute providing for an action against the party responsible for death by wrongful act. As conceded and shown by the authorities cited in the majority opinion, the American courts, practically without exception, sustain the doctrine that upon proof of the negligent act of the defendant resulting in the death of a person, and of the existence of a party entitled to recover under the provisions of the statute, a presumption at once arises that the party entitled to recover has sustained at least nominal damage. The opinion further concedes that in actions of this character, in determining the amount of damage sustained, juries are not confined to a consideration of the evidence alone as in other classes of actions, but may exercise a much wider latitude in applying their own knowledge and experience to the facts of the case than would be proper in most other cases. These points admitted, it seems to me that it necessarily follows, unless it can be said that there is no competent evidence to show that the death of the child resulted from the act of the defendants, that the plaintiff in this action has sustained at least nominal damage. If the plaintiff was entitled to even nominal damage, the district court was clearly in error in directing a verdict for the defendants. I entirely fail to understand how such error is obviated by the consideration that "it is obvious that with a female child three months old, dangerously ill, the pecuniary value of its life during its minority is wholly problematical and speculative." It is doubtless true that, after death, the pecuniary value of the life of any person within his minority, or in fact during any period of vital expectancy, is problematical in the sense that it can be determined only upon considerations that may be, from the ordinary legal standpoint, regarded as conjectural and speculative. It is also true that to strictly apply a rule of evidence requiring such pecuniary value to be shown with the exactness of mathematical calculation will entirely frustrate the purpose of the statute providing for an action for death by wrongful act, and prevent a recovery in any case whatever.

The statute under which this action is brought provides for an action in favor of the proper parties whenever the death of a "person" shall be caused by the wrongful acts of another. Section 7686, Rev. Codes 1905. This statute was enacted with an apparent legislative intent to provide a new right of action for the redress of

wrongs that by common law were without remedy. Being thus remedial in character, the statute should be liberally construed by the courts in a spirit that will, so far as lies within its terms, effectuate the remedy designed by the Legislature. A construction that will bring the statute into practical operation for the purpose for which it was obviously designed should be preferred to one that will render it nugatory and inoperative in any important particular. Under such construction an infant or child of immature and tender years is as truly a "person" within the meaning of the statute as an adult. The pecuniary damage resulting from the death of such an infant may not be so large in amount as if it were a person of mature years, having complex family relations; yet, according to all human experience, such damage is substantial, and should be determined by the same rules applied in an action for the death of an older person. There is an evident legislative purpose apparent in every part of the statute that in every case of death by wrongful act, whatever the age or capacity of the decedent, a jury shall examine into the facts and circumstances, and award "damages proportionate to the injury" to the party entitled to recover. In the light of these principles, and of those conceded by the majority opinion, it is difficult to comprehend how the fact that the child was but three months old and dangerously ill rendered the pecuniary value of its life during its minority more problematical and speculative than that of the almost innumerable cases in which recoveries have been sustained, under similar statutes, in the American courts.

Conceding that the pecuniary value of the life of a child thee months old is at least nominal, and probably substantial, on what reasonable principle can it be held that the fact it was suffering from a dangerous disease renders a finding in support of plaintiff's contention as to the cause of death "pure conjecture and guesswork?" It is admitted by the physician attending the child that, after the administration of the medicine containing morphine, the child exhibited symptoms of poisoning so unmistakeable that he considered it necessary, as an important part of his professional duty in the treatment of the case, to at once take vigorous measures to counteract these poisonous effects, and that his attention for a period of about four hours was devoted exclusively to that purpose. This treatment required the introduction of a rubber tube into the child's stomach, through which was poured a solution of permanganate of potash, and the injection into its veins of atropine, both chemicals

sufficiently powerful to decompose morphine and render it inert, together with manipulation of the body and lungs for the purpose of strengthening respiration and heart action. He claims by this course of treatment to have been entirely successful in counteracting the effect of the poison; but it is freely admitted by the medical testimony that such a course of treatment, while perhaps effectual in producing an evacuation of poison from the system, would have been extremely exhausting and debilitating even to a mature person. One physician testified that he had known two cases in which an attempt to wash out the stomach of an adult by means of a tube had produced convulsions in the patient. And it is apparent at a glance that the combined effect of the poison and the treatment necessary to the antidote must have seriously depleted the small reserve of strength of this young child, and reduced to a low ebb its vitality. With these facts before it a jury, without conjecture, speculation, or guesswork, might readily find that the administration of the morphine, together with the treatment necessary to counteract its effects, was largely instrumental in producing the death of the child. I believe that few persons can follow the entire evidence of this case and not feel strongly impressed with such conclusion.

Whether the poison operated directly in producing the child's death, or acted as a predisposing cause by weakening its constitutional powers of resistence to disease, as testified by Dr. Engstad, the defendants are alike responsible. The fact that disease was also operating at the time of the administration of the poison, and that disease of itself might have been fatal, does not raise a presumption that it did in fact produce the child's death. Death may be the result of several concurring causes, any one of which, operating alone, might not have fatal result. If the poisoning contributed to produce the child's death by so impairing its strength and vital forces as to render the disease incurable, when without the poisoning it might have yielded to treatment, the defendants are liable to exactly the same extent as though it had been the only cause. A jury in an action of this character cannot apportion the damage allowed, according to the injury produced by each or two or more concurring causes. The point for the jury is, did the negligent act of defendants operate as one cause, and did its effects contribute to produce the death of the child? If it did, the defendants will not be relieved of responsibility by showing that other causes operated at the same time to the same result. Louisville & C. R. R. Co., v. Jones,

83 Ala. 376, 3 South. 902; Thompson v. Louisville & N. R. Co., 91 Ala. 496, 8 South 406, 11 L. R. A. 146; Jucker v. Chicago & Railway Co., 52 Wis. 150, 8 N. W. 862; People v. Cook, 39 Mich. 236, 33 Am. Rep. 380; Beauchamp v. Saginaw Min. Co., 50 Mich. 163, 15 N. W. 65, 45 Am. Rep. 30; Louisville, etc., Railway Co. v. Snider, 117 Ind. 435, 20 N. E. 284, 3 L. R. A. 434, 10 Am. St. Rep. 60.

The majority opinion holds that from the evidence introduced, "no jury could say what caused the child's death." This being true, it necessarily follows that neither the jury by its verdict, nor the court as a matter of law, could say that the child's death was caused by uremia, "the dangerous disease" whose presence so complicated the situation. As death unquestionably resulted, it follows that the only conclusion possible from the evidence is that it was produced by a complexity of causes, prominent among which are the administration of the poisonous drug and the exhaustion attendant upon the treatment necessary to counteract its effect. How such conclusions could entitle the defendants to a directed verdict I am wholly at a loss to understand. If the child had been in health at the time the morphine was administered, there could be no reasonable question but that its subsequent death was caused by poisoning. The fact, however, that it was at this time suffering with a dangerous disease, according to the holding of the majority opinion, at once removes the question of the cause of death into a region of speculation, surmise, and conjecture, and renders it impossible for a jury to render any verdict other than one in favor of the defendants. If such holding is to be regarded as a settled practice of this court, it becomes a serious question whether there can be said to be any liability on the part of a druggist who negligently compounds and delivers a poison to one already suffering from a dangerous disease.

Such holding is, however, as I regard it, more reasonable and consistent with principle than that which declares that plaintiff's cause of action is defeated by contributory negligence on the part of the father. By the terms of the statute this action cannot be maintained by the father of the child in his own right, but only as personal representative of the child. The widow or children of a decedent may sue in their own names, respectively, but the father is without standing except as the personal representative. The cause of action falls within the jurisdiction of the county court as a portion of the

assets of the estate of a deceased person. The father brings this action as the agent or instrument of the county court, and any recovery had will reach his hands as administrator, and must be strictly accounted for to that court. The county court will then proceed with its administration of the child's estate, and determine to what person, or persons, the assets of the estate are to be distributed. It is true that the law of succession of this state provides that the father of an unmarried child who dies without issue is its heir, or, in case of his death, the mother. It is apparent that a very considerable interval of time must elapse, and many uncertain events transpire, between the time of any recovery in this action and the determination of the county court as to who are the child's heirs at law, and the distribution to them, subject to the expenses of administration of the assets of the estate, and it seems to me that it is only by an amount of speculation, surmise, conjecture, and guesswork, very much greater than that necessary to determine the cause of the child's death in this case, that a court can say that the father of the child will then be living, and that there will be remaining, of that particular asset of the child's estate realized from a recovery of this action, a portion so considerable as to confer any pecuniary benefit on him. Whatever recovery is had comes to the father in his representative capacity only, in the right of the child, on the theory that it is such a cause of action as the child might have maintained if living. And I can conceive of no reasonable theory, except the absolete and now generally discredited one of imputed negligence, under which contributory negligence of the father can be said to be a defense in an action of this character brought by him as personal representative of the child. This view is supported by very respectable authority. Wymore v. Mahaska County, 78 Iowa, 396, 43 N. W. 264, 6 L. R. A. 545, 16 Am. St. Rep. 449; Norfolk & W. R. R. Co. v. Groseclose's Adm'rs, 88 Va. 267, 13 S. E. 454, 29 Am. St. Rep. 718.

But the acceptance by this court of the doctrine that contributory negligence of a father is a defense to an action brought by him as a personal representative, for the death by wrongful act of a child, is, in my opinion, very far from warranting the further holding of the majority opinion that the father, Jacob Scherer, was, as a matter of law, guilty of contributory negligence in this case. There are facts bearing upon this question, which might have been given controlling importance by a jury, which are entirely disregarded by

the majority opinion; and, among these facts, I will ask attention to the following: Both the plaintiff, Scherer, and his wife were uneducated and unfamiliar with the English language and especially with English writing. Mrs. Scherer could not read writing at all, and Scherer only imperfectly. An older child of theirs had been sick for a period of almost two months before this time. During its sickness Scherer had gone to defendants' drug store to procure medicines prescribed by the attending physician, and some of these he had received in bottles in liquid form. This older child had died on the morning of the day on which the morphine was administered to the infant. Its body was in the house at the time, and Scherer had been busy throughout the day with the funeral arrangements. Both he and his wife were in an excited and nervous condition. Scherer was not present at the time the prescription for the baby was received from Doctor Taylor and sent to the drug store. He came in after the bottle of medicine had been brought, and conversed with his wife somewhat regarding it. Mrs. Scherer told him that the doctor had said that the medicine would be a powder. Scherer examined the bottle, and was able to make out the name of Doctor Taylor on the label and the direction to give the medicine every two hours. The name "Rose Clark," also appearing on the label, he states, was a little blurred on the second word, and, owing to his inexperience with English writing, he could make out only the word "Rose," which he supposed was part of the name of the medicine. Before giving the medicine to the child, the fact that it was a liquid instead of a powder was discussed somewhat between him and his wife, and they came to the conclusion that the doctor had changed his mind with reference to the ingredients after leaving their home, and that the liquid had been sent as the result of a subsequent direction given by him at the drug store. The fact that Doctor Taylor's name appeared on the label was taken by them as a guaranty that it was the right medicine. After the first dose of medicine had been given, and the child showed no signs of improvement, but seemed to grow worse, Scherer went to the house of a neighbor for the purpose of calling Dr. Taylor by telephone.

In determining whether or not the negligence of Scherer contributed to the death of the child, not only should all testimony that conflicts with the evidence of Scherer and his witnesses be disregarded, and all inferences taken most strongly in his favor, but whatever

seems hasty or ill-considered in his acts should receive a certain mitigation from the influences of surrounding circumstances, such as the excited mental condition of Scherer over the death of his other child, the many other serious matters with which his mind was occupied at the same time, the anxiety to do without delay whatever would relieve the sickness of the baby, and the implicit faith that unlettered people place in the prescription and advice of a physician attending their children. Under the circumstances of this case to measure the conduct of Scherer by rules even more inflexible than would be applied to that of a well-educated man, in the full possession of all his faculties of mind, experienced in the reading of writings and in the treatment of sickness, is obviously unjust. There is nothing in his conduct that does not seem to have been prompted by regard for the welfare of the child, and, under the trying conditions, an error of judgment should not be treated as a culpable lack of care. To hold that his acts constitute contributory negligence as a matter of law is, in my opinion, to disregard or misapply every precept adopted by this court to govern its action in such cases.

In my view of this case there are disputed questions of fact, both upon the point of the cause of the death of the child and the contributory negligence of the father, which the trial court should have submitted to the jury for detemination. Even though the rule requiring that the evidence be given a construction most favorable to the party ruled against were reversed, I believe the evidence on these points still presents facts from which different impartial minds might fairly draw different conclusions. To hold that all reasonable and fair-minded men, with the facts of this case before them, can draw therefrom but one conclusion almost reaches absurdity, in view of the fact that the judges of this court, after a long and careful consideration of the evidence, are divided in their opinion.